Argued February 4, affirmed March 16, 1920.

## MACK *v.* THATCHER.

(187 Pac. 1114.)

**Appeal and Error—Party cannot Complain of Confirmation of Defendant's Title to Property Which He Did not Claim.**

1.   Where in a suit to cancel deeds to separate pieces of property plaintiff testified that he did not claim one of the pieces of property, did not want it, and was willing that it should be decreed to defendant, he cannot on appeal attack the decree confirming defendant's title thereto.

**Deeds—Evidence Held to Show Undue Influence by Real or Imagined Fears of the Plaintiff's Wife.**

2.   Where plaintiff, 87 years old and blind and deaf, joined his wife in conveying to defendant, her nephew, who was living with them, property purchased with plaintiff's money, being induced by her fears, caused either by defendant's threats or by her hallucination that defendant would leave them helpless, plaintiff's conveyance was not the act of his will and will be set aside.

From Multnomah: GEORGE W. STAPLETON, Judge.

Department 1.

This is an equitable proceeding, wherein plaintiff seeks the cancellation of certain conveyances of real property. The substance of the complaint is that on July 13, 1910, plaintiff married Sarah Cleveland Mack, the plaintiff then being 80 years of age and the bride

about 65. Prior to the marriage both of them were leading comparatively lonely lives, the plaintiff's children being grown, and having homes of their own, while the wife's only relative was the defendant herein, who was her nephew, then about 30 years of age, and who had lived with his aunt, plaintiff's wife, for several years. At the time of the marriage the wife was the owner of three lots in the City of White Salmon, Washington, bringing in revenue to the extent of about $10 per month, and shortly after the marriage the plaintiff entered into a contract for the purchase of a small property in that portion of the City of Portland known as St. Johns, which was used as a home by plaintiff and his wife, and which was paid for in small monthly installments by the plaintiff from moneys received by him as a pensioner, he having been a veteran of the Mexican War. When the final payment was made, it is alleged that the defendant, by reason of his aunt's unbounded affection for, and confidence in him, was successful in persuading plaintiff to have the conveyance taken in his wife's name, by representing that she, by reason of the fact that she was fifteen years younger than plaintiff, would doubtless outlive him, and that, if the home were in her name, she would be relieved of the trouble and expense of probate proceedings, and that if plaintiff did not so act, the defendant would leave them uncared for in their old age, and would not assist them. The deed to plaintiff's wife was executed on December 29, 1916.

During the summer of 1917, the wife became very ill, suffered extreme physical pain and mental anguish, to such an extent as to render her mentally unbalanced, so that she acquired a very melancholy attitude toward life, was filled with gloomy forebodings of disaster, imagining that her nephew was going to leave her in

her illness, and her mind became so affected that she was incapable of comprehending the nature and effect of any act she might perform, and defendant, being aware of her condition, and of the further fact that plaintiff, by reason of his extreme age, was practically helpless, intimidated his aunt by his threats of leaving them helpless, and, through her, and her consequent importunities, coerced the plaintiff to such an extent that the two were prevailed upon to execute conveyances to defendant of all their real property, which conveyances were executed on October 27, 1917, and no consideration was paid by him therefor.   The wife died on November 1, 1917, three days after the execution of the aforesaid conveyances.

The answer admits the marriage, the ages of the parties, the relationship of defendant to the deceased wife of plaintiff, the purchase of the St. Johns property, and the payment therefor from moneys derived from plaintiff's pension, and the ownership by the wife, of the property in White Salmon.   All other allegations are denied.

A trial was had resulting in a decree awarding a cancellation of the conveyance of the St. Johns property, but confirming the title to the White Salmon property in defendant.   From this decree both parties appeal.                                AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. A. Hansen* and *Mr. Henry S. Westbrook.*

For respondent there was a brief over the names of *Mr. Arthur I. Moulton* and *Mr. William P. Lord,* with an oral argument by *Mr. Moulton.*

BENSON, J.—1, 2. There are no new or unsettled legal questions presented by this appeal. Plaintiff's cross-appeal is based upon the action of the trial court in confirming defendant's title to the property in White Salmon. As to this it is sufficient to say that plaintiff repeatedly asserted, while upon the witness-stand, that he was not claiming the White Salmon property, did not want it, and was perfectly willing that it should be decreed to be the property of defendant. Regarding the St. Johns property, the defendant insists that the decree entered by the trial court is not justified by the evidence. This contention is resisted with equal vigor by the plaintiff.

After a very careful investigation of the record, we find the facts to be substantially as follows: At the time of the wedding in 1910, the plaintiff, who was a pensioned veteran of the Mexican War, was about 80 years of age, a widower, whose children had all reached the age of maturity, having homes of their own; the woman who then became the wife of the plaintiff was a widow, who had experienced two prior marriages. Her first husband died, and she had obtained a divorce from the second. At the time of this third marriage she was about 65 years of age, and was then conducting a rooming-house in Portland, assisted by her nephew, the defendant.

Shortly after the marriage they decided to acquire a home of their own, and purchased the assignment of a contract to buy a house and lot in St. Johns, which is now a part of Portland. A new contract was issued by the owner of the legal title, and therein plaintiff and his wife were named as the purchasers. It was suggested by the vendor that, since both of them were well advanced in years, it would be well for each of them to assign his or her interest in the

contract, so that the survivor of them might complete the payments and secure the legal title without expensive legal proceedings, and the plaintiff did execute such an assignment to his wife. The wife, however, was subsequently reluctant to make such an assignment, and the plaintiff, assuming that, if he happened to outlive her, he would be her sole heir in any event, did not press the matter. The defendant continued to live with the aged couple for the greater portion of the time until the death of his aunt. The monthly payments upon the property were all made by the plaintiff from his pension money, and from the proceeds of a piece of real property in eastern Oregon, belonging to plaintiff, and on December 29, 1916, full payment having been made a deed was issued to the wife.

During the summer of 1917, the wife became seriously ill and gradually such illness increased in severity until on November 1st of that year she died. She had at all times displayed a very strong affection for the defendant, and after her illness became serious she assigned to him her bank deposits, amounting to about $500. The fact that she had this money had never been disclosed to the plaintiff. On September 23, 1917, at her solicitation, the defendant acted as scrivener in the making of a will for his aunt, wherein she devised everything she had to him, including the home. Thereafter she became dissatisfied with that manner of disposing of her property, and a notary public was called in who prepared conveyances of both the St. Johns property and the White Salmon property. During the last two years prior to the death of Mrs. Mack the plaintiff's eyesight had been rapidly failing, and for some time he had been practically blind, and was also very deaf, so that for the last three months of Mrs. Mack's life, both she and her

husband were almost helpless and dependent upon the nephew for their care.   Speaking of the execution of the deeds, and existing conditions at that time, the plaintiff testifies as follows:

"And when she got sick she got deranged, and it was a strange derangement; she imagined that everything bad was coming to her and nothing good.   On the very day that those deeds were signed in the evening just before dark, Charles had some things out on the line, and it looked like rain, and he went out to put them in a storeroom that we had, and it was just adjoining the toilet and before that she had told me that Charles Thatcher was going to put her down in the cesspool; she was afraid he was going to put her down in the cesspool, and I told her he couldn't do it, the hole was not big enough, and she said: 'He could tear up the seat.'   And the last night before that she came in and she says: 'Charles has the hatchet and he is going to take up the seat and put me down in the cesspool.'   And then she came and sat by me and she says: 'Charley is going to leave, and he is going to take you with him, and he is going to have the light and water and gas shut off, and he is going to leave me without nothing but the stove and woodpile.'   And she says: 'I am going to lose my sight, and my hair, and then I am going to lose my hearing and the use of my hands and feet, so that I cannot wait on myself, and I will be just as helpless as a baby, and no woman will take care of me in such a condition as that without good pay, and I haven't got a cent to pay a woman with, Charley has got everything.'   And before we signed those deeds, when he went to Wolcott's, or when he went to phone for Wolcott, while he was gone, she says to me: 'I don't want to sign those deeds, I don't want to sign them.'   She didn't want to part with her property until she was dead, she wanted to keep it as long as she lived, and I had that property deeded to her for that very purpose, that when I died she would have a home. * * I know of nothing that transpired between them

except from what she told me, but she told me plainly that she did this under coercion, this signing of the deeds, that he threatened to put on his hat and leave us in our helplessness unless we did deed him everything that we had, and she said that he would not stay and care for us unless he had his pay, and the will that she was going to make, he was explaining all that day that it might be contested and that it would not take effect until after I died, and he insisted on deeds, and if she had been sound and well I would have refused, but so long as she was suffering so badly I couldn't refuse her anything, and she was suffering so intensely worse than anything I ever saw in my life, and it distressed me, for I loved the woman; she was a good, kind woman. It was forced, and it might just as well have been a revolver placed to our breasts and told us to sign those deeds. She didn't want to do it, and she told me, she says: 'I don't want to sign those deeds,' but she thought she had to—anything rather than have him go away and leave us in our helplessness. I was blind and she was sick unto death."

The defendant testifies that he never asked his aunt to give him any of her property, and that so far as he was concerned, her action was purely voluntary, and that the consideration for the conveyances was love and affection. If we accept as true the statements which the wife made to her husband as to the reasons which actuated her in executing the conveyance, then there can be no controversy but that she was the victim of undue influence. But, upon the other hand, if we adopt as true the testimony of the defendant, and that he did not threaten to desert them in their hour of need, then it equally follows that as to her the deed is invalid for the reason that she was suffering from a hallucination which controlled her action and the deed was not her voluntary act.

Regarding the execution of the instrument by the plaintiff the evidence is clear that it was not an act of free and competent will power. The pressure brought to bear upon him by the terrified pleadings of his dying wife was sufficient to dominate his will and overwhelm his judgment. The defendant had at a prior date received from his aunt a transfer of her bank account, amounting to about $500, the possession of which, by either of them, had been carefully concealed from the husband, who was then 87 years old, blind and deaf. Prior to the time of the execution of the deeds, the defendant had procured a blank form of a will, and had filled it out with a careful description of all the property of the old couple, which was presented to the old lady for signature, and was duly and properly executed by her. The deeds, which were executed on the fourth day before her death, were apparently for the purpose of making assurance doubly sure, that the old man should be stripped of everything but his pension. We think the evidence sufficiently establishes the finding of the trial court that undue influence was exerted upon the plaintiff to secure his execution of the conveyance, and that it was not his voluntary act. The decree of the lower court is affirmed, neither party to recover costs in this court.

AFFIRMED.

McBRIDE, C. J., and HARRIS and BURNETT, JJ., concur.